James B. WATLER, Libelant,

v.

The M/V SEA LANE, formerly known as M/V Lillian, her engines, etc., Respondent.

No. 63-138.

United States District Court
S. D. Florida.

July 14, 1964.

Alfred M. Carvajal, Miami, Fla., for libelant.

G. Morton Good, Smathers & Thompson, Miami, Fla., for respondent.

FULTON, District Judge.

This is a cause in admiralty. The Libelant seeks relief in rem against a vessel, which is now known as the M/V "SEA LANE" but which bore the name of M/V "LILLIAN" when this alleged cause of action accrued.

The Libelant seeks double wage penalties under the provisions of Title 46 U.S.C.A. § 596.

This Court has jurisdiction over the parties to and the subject matter of this cause of action.

The libel alleges that wages were wrongfully withheld from Libelant for the period from December 28, 1962 through January 2, 1963; and that pursuant to said statute, Libelant is entitled to recover double pay for each day that his wages were wrongfully withheld.

The Claimant-Respondent filed an answer wherein the material allegations of the libel were specifically denied.

The issues of this cause were tried in open court on the 25th day of May, 1964. The result of the trial depended

upon the applicability of said Section 596 to the facts of the case, and upon the Court's judgment of the credibility of the witnesses.

### FINDINGS OF FACT

1. At all times material hereto, the Respondent vessel the M/V "SEA LANE" EX M/V "LILLIAN" was in the Port of Miami, Florida.

2. Libelant, JAMES B. WATLER, a Honduran citizen, signed aboard the M/V "SEA LANE", which vessel was at that time known as the M/V "LIL-LIAN", as mate in Miami, Florida, on December 7, 1962. His pay scale at that time and at all material times hereto was $150.00 per month plus found.

3. The M/V "SEA LANE" EX M/V "LILLIAN" was and is at all material times hereto a cargo vessel engaged exclusively in trade between the Port of Miami, Florida, and various ports in the Bahama Islands, and as such, was engaged in trade between the United States and British North American possessions.

4. The M/V "SEA LANE" EX M/V "LILLIAN" arrived in the Port of Miami on the morning of December 31, 1962, and on that date the Libelant received the sum of $75.00, which represented the balance of Libelant's earned wages for the month of December, 1962.

5. The M/V "SEA LANE" EX M/V "LILLIAN" remained at her dock in the Port of Miami from the morning of December 31, 1962 until approximately 12:30 A.M. January 3, 1963, at which time she set sail for Nassau, New Providence, Bahama Islands, with intermediate stops. At the time the M/V "SEA LANE" departed Miami on January 3, 1963, the Libelant was not aboard. Because of his absence from the vessel, his personal effects were put ashore sometime prior to sailing.

6. It is disputed as to whether or not the Libelant was aboard the vessel during the working hours of January 1 and January 2, 1963, and was performing his assigned responsibilities of supervising the loading and securing of cargo on January 2, 1963. The Libelant tes-tified that he was aboard on those two dates performing all of the duties which are normally expected of him, including the supervision of the crew in chipping, painting, sandblasting and other work in and around the vessel, and supervised the stowing and securing of the cargo. No witnesses were produced by the Libelant to corroborate his testimony. The Libelant testified that certain crew members had seen him aboard the vessel on January 1 and January 2, 1963. These crew members were called to testify by the Claimant-Respondent. None of them corroborated Libelant's testimony, but, rather, stated that they had not seen him aboard the vessel on January 1 or January 2, 1963. They testified that they did not see him until sometime around midnight of January 2, 1963.

The cook, INGLIS PENN, was called by the Claimant-Respondent. He testified that he shared a room with the Libelant aboard the M/V "SEA LANE" and that the Libelant departed the vessel on the evening of December 31, 1962, and did not return to the vessel until approximately midnight of January 2, 1963. He further testified that the Libelant did not occupy or sleep in his bunk on the nights of December 31, 1962 or January 1, 1963. This was one reason Claimant-Respondent refused, and still refuses, to pay to the Libelant his claimed wages for January 1, and January 2, 1963.

The Court, after considering all of the testimony of the parties and their witnesses, finds that the Libelant did not report for duty aboard the M/V "SEA LANE" EX "LILLIAN" on January 1 and January 2, 1963; that he did not perform his duties as mate of the vessel on those dates; and, therefore, he did not earn his wages.

7. It is also disputed as to whether or not the Libelant demanded his alleged earned wages, he testifying that the next time the vessel returned to port, which was approximately one week subsequent to January 2, 1963, he went to the Captain and requested his wages for January 1 and January 2, 1963. The Libel-

ant admitted that he at no time went to the offices of Claimant-Respondent and made a request for wages, although Claimant-Respondent's offices were immediately adjacent to the docks where the M/V "SEA LANE" tied up and although he went to the offices for the purpose of securing his personal effects. Libelant also admitted that he made no request for wages to Mr. Jack Curtis, the General Manager of Claimant-Respondent, although he admittedly talked with Mr. Curtis on January 3, 1963, and secured his personal effects from him at that time. The Captain of the M/V "SEA LANE" denied that Libelant ever requested any wages and, in fact, testified that he did not even see Mr. Walter until many months after January 2, 1963. The Court, after considering the above conflicting testimony, finds that Libelant herein made no demands nor claimed any unpaid wages prior to the institution of litigation.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter of this suit and of the parties hereto.

2. The Libelant has not proven by a preponderance of the evidence that he is entitled to recover wages for January 1 and January 2, 1963.

3. Even if Libelant were entitled to recover wages for January 1 and January 2, 1963, the Court concludes that he is not entitled to recover any penalties. Libelant bases his claim for such penalties on Title 46 U.S.C.A. § 596. However, that statute is made inapplicable to vessels engaged in trade between the United States and British North American possessions. This exception to the double wage penalty imposed by Section 596 is expressly set forth in Title 46 U.S.C.A. § 544, which section provides as follows:

"None of the provisions of sections 201–203, 542a, 543, 545, 546, 561, 562, 564–571, 574, 577, 578, 591–596, 600, 621–628, 641–643, 644, 645, 651, 652, 662–669, 701–709, 711, 713 of this title shall apply to sail or steam vessels engaged in the coastwise trade, except the coastwise trade between the Atlantic and Pacific coasts, or in the lake-going trade touching at foreign ports or otherwise, or in the trade between the United States and the British North American possessions, or in any case where the seamen are by custom or agreement entitled to participate in the profits or result of a cruise, or voyage. June 9, 1874, c. 260, 18 Stat. 64; Mar. 3, 1911, c. 231, § 291, 36 Stat. 1167."

It should be noted that Libelant contends that the effect of Section 544 on Section 596 cannot be considered in the present case because the pretrial stipulation does not specifically refer to Section 544 as an issue. The pretrial stipulation refers to the question of whether "there was in existence" a maritime lien under Section 596, and the Court is of the opinion that this statement fairly includes the obvious question of the nature and extent of the liability under Section 596.

The Court has found that the M/V "SEA LANE" EX "LILLIAN" was engaged in trade between ports of the United States, to-wit: the Port of Miami, Florida, and British North American possessions, to-wit: Nassau, New Providence, Bahama Islands. The Libelant urges that the exception set forth in Section 544 includes not only coastwise trade between the Atlantic and the Pacific coasts but also the lake-going trade and trade between the United States and British North American possessions. The Respondent contends, and the Court agrees, that the exception applies only to the coastwise trade between the Atlantic and Pacific coasts and that the statute must be read so that none of the specified sections of the Shipping Commissioner's Act will apply to the coastwise trade, to the lake-going trade, or to the trade between the United States and British North American possessions, but that the specified sections shall apply only to coastwise trade between the Atlantic and Pacific coasts.

The Court has found ample support for this latter interpretation of the statute but is unable to find any support for the Libelant's construction. Thus, in Johnson v. Standard Oil Co. of New Jersey, 33 F.Supp. 982 (D.C.Md.1940), the District Court was faced with the problem of whether or not the Libelant was entitled to an extra month's wages under the provisions of Title 46 U.S. C.A. § 594, the Libelant having shipped for a voyage from the Port of Texas City, Texas, to Halifax, Nova Scotia, and such other ports and places as the master might direct. The Court, in holding that the Libelant was not entitled to the wage penalty provided by Section 594, stated on page 983 as follows:

"I do not think the above statute applies because 46 U.S.C.A. § 544, expressly excepts the present type of voyage from the provision of Sec. 594 just quoted, Sec. 594 being part of the Shipping Commissioner's Act of June 7, 1872, referred to in Sec. 544, which is as follows: * * (§ 544 quoted)

"In United States v. The Grace Lothrop, 95 U.S. 527, 24 L.Ed. 514, the Supreme Court was called upon to construe another part (with which we are not here concerned) of the Shipping Commissioner's Act of June 7, 1872, and in the course of its opinion the Court said: (page 532 of 95 U.S., 24 L.Ed. 514) 'Though the act last referred to (which is the present Section 544 here in issue) is subsequent in date to the supposed wrongful acts of the respondent, as alleged in the libel, yet the language of the act is in terms an explicit declaration that Congress never intended that the original act should apply to vessels engaged in any part of the coasting trade, except that between the Atlantic and Pacific coasts.'

"The above statement, although in a sense dicta, must be followed, with the result that Section 544, Title 46, is to be interpreted as though it read as follows:

'None of the provisions of the Shipping Commissioner's Act shall apply to vessels engaged in coastwise trade, or in the lake-going trade, touching at foreign ports or otherwise, or in the trade between the United States and the British North American possessions, or in any case where the seamen are by custom or agreement entitled to participate in the profits or result of a cruise, or voyage, with the single exception of the coastwise trade between the Atlantic and Pacific coasts.' Thus, Section 544 is inapplicable to the present situation because the voyage was not from coast to coast."

In the case of Mahar v. Gartland S. S. Co., 62 F.Supp. 158, (D.C.W.D.N.Y. 1945, affirmed 2d Cir. 1946), (154 F. 2d 621), the District Court was faced with almost the identical proposition as presented in the instant case, only involving the lake-going trade rather than trade between the United States and British North American possessions. In that case, the District Court stated as follows:

"Section 596 was one of the provisions contained in the Shipping Commissioners Act of June 7, 1872, c. 322, 17 Stat. 262. Section 544 of Title 46 U.S.C.A. provides that none of the provisions of certain enumerated sections of Title 46, including Secs. 591–596, shall apply to sail or steam vessels engaged in the lake-going trade. The sections enumerated in Sec. 544 are those contained in the Shipping Commissioner's Act and this section is to be taken as meaning that none of the provisions of the Shipping Commissioner's Act apply to vessels in the lake-going trade. Johnson v. Standard Oil Company of New Jersey, D.C. 33 F.Supp. 982. Since the plaintiff is not entitled to double wages for the period of delay in payment under Sec. 596, double wages are not recoverable under Sec. 597. The limit of recovery to which plaintiff is entitled under the

claim is $44.40 with interest. Motion granted."

In the case of United States v. Bain, 40 F. 455 (D.C.E.D.Wis.1889) the Libelant made the same contention in regard to the construction of Section 544 as does the Libelant herein. The District Court, in disposing of this contention, stated on page 456 as follows:

"It is suggested that the exception includes all subsequent parts of the act. Such contention cannot be maintained. That construction would render altogether unnecessary and out of place the reference to seamen participating in the profits of a voyage, and would defeat the evident intention of congress to exempt that class from the operation of the shipping commissioners' act. The exception in the law has reference only to the coastwise trade between the Atlantic and Pacific coasts. The word 'coastwise,' as used in the statute, means along that part of the territory of the United States bordering upon and washed by the sea. It does not comprehend inland navigation. This is apparent upon the face of the shipping commissioners' act. It was intended to apply to ocean navigation solely. Shipping commissioners were to be appointed only in ports of ocean navigation. 17 St. c. 322, § 1; Rev.St. § 4501. Written agreements with seamen were to be made before proceeding on a voyage from a port in the United States to any foreign port, and from a port on the Atlantic to a port on the Pacific, and *vice versa*, (section 12 of the act;) and by a proviso it was expressly declared that the section should not apply to masters of lake-going vessels that touch at foreign ports. This was inserted *ex industria*, lest that class of vessels might be supposed to be included in the phrase, 'on a voyage from a port in the United States to any foreign port.' In U. S. v. The Grace Lothrop, supra, the supreme court, speaking with respect to a vessel in the coastwise trade, declare that the act of 1874 is 'an explicit declaration that congress never intended that the original act should apply to vessels engaged in any part of the coasting trade, except that between the Atlantic and Pacific coasts.' It is quite as clear that congress never intended the act to apply to the lake-going trade. The act had reference to ocean navigation alone. Within a year after the passage of the act, congress abolished the necessity of shipping articles with respect to vessels engaged in trade between the United States and the British North American possessions, the West India islands, and the republic of Mexico. 17 St. c. 35, p. 410. It cannot be presumed that the lawmaking power designed to remove the restrictions as to vessels trading with neighboring foreign ports, to exempt vessels in the coastwise trade (except between Atlantic and Pacific ports), but not vessels in the lake-going trade. The act was manifestly directed to extended ocean voyages. It is also to be observed that in the original act the terms 'coastwise trade' and 'lake-going trade' are used in contradistinction. The act of 1874 clearly expresses the intention of congress to restrict the shipping commissioners' act to ocean navigation, excluding all coastwise trade except that between Atlantic and Pacific ports. In Burdett v. Williams [D.C.], 27 Fed.Rep. 113, 117, it was ruled that, since the act of 1874, none of the provisions of the act of 1872 apply to vessels in the trade between the United States and the British North American possessions, or in any case where seamen are entitled to participate in the results of a voyage. Like construction excludes vessels engaged in commerce on the Great Lakes. The demurrer is sustained, and the defendant discharged."

The Court also refers to the case of Caribbean Federation Lines v. Dahl, 315 F.2d 370 (5th Cir. 1963) in which case the Fifth Circuit Court of Appeals, although not directly construing Section 544, does by implication uphold the construction placed upon this section by this court in this opinion. Thus, on page 373, the Court states:

> "Appellant further contends that by virtue of Section 544 which renders inapplicable Section 596, where the vessel is engaged 'in trade between the United States and the British North American possessions,' that Appellees are not entitled to penalty wages, claiming that the Amigo was under a charter when it left Pascagoula to load railroad cross ties in Mobile for Seven Rivers, Canada."

The Fifth Circuit in denying this contention of the appellant does not do so on the basis that the appellant's construction of Section 544 is wrong, but does so on the basis that factually the vessel was not engaged in trade between the United States and British North American possessions. The Fifth Circuit Court stated:

> "Appellees' contracts were for services in the 'Gulf Trade—West Indies and Overseas Trade' and they were bound to the vessel for a period of one year to go to any place in the world where the vessel might be ordered. A conclusion that the vessel was *engaged* in trade between the United States and the British North American possessions during the period of December 4, 1958, to January 21, 1959, when Appellees were aboard her, does not square with the facts or the realities of the situation and cannot be sustained."

5. As an additional conclusion of law, and even though Title 46 U.S.C.A. § 596, were deemed to be applicable to the instant situation, the Court is of the further opinion that the penalties claimed should be denied because the withholding of the Libelant's wages, even if earned, was not arbitrary, willful or unreasonable and was, therefore, not without sufficient cause.

Title 46 U.S.C.A. § 596, reads in part as follows:

> "Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned *without sufficient cause* shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods * *.''
> (Emphasis added)

1 Norris, The Law of Seamen (1962), § 384, page 413, states:

> "Without doubt, the question of sufficient cause is the most important element of this statute and that theme predominates in virtually every litigation involving the double wage penalty."

The absence of sufficient cause is required to entitle a seaman to the benefit of the double wage provision. McConville v. Florida Towing Corp., 321 F.2d 162 (5th Cir. 1963). The question of what constitutes sufficient cause within the intendment of the statute was discussed in Collie v. Fergusson, 281 U. S. 52 at page 55, 50 S.Ct. 189, at page 191, 74 L.Ed. 696 (1930), as follows:

> "The phrase 'without sufficient cause' must be taken to embrace something more than valid defenses to the claim for wages. Otherwise, it would have added nothing to the statute. In determining what other causes are sufficient, the phrase is to be interpreted in the light of the evident purpose of the section to secure prompt payment of seamen's wages (citation omitted), and thus to protect them from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed.
>
> "The words 'refuses or neglects to make payment * * * without sufficient cause' connote, either conduct which is in some sense arbitrary or willful, or at least a failure not at-

tributable to impossibility of payment. We think the use of this language indicates a purpose to protect seamen from delayed payments of wages by the imposition of a liability which is not exclusively compensatory, but designed to prevent, by its coercive effect, arbitrary refusals to pay wages, and to induce prompt payment when payment is possible."

The statute thus confers no right to recover double wages where the delay in payment of wages due was not in some sense arbitrary, willful or unreasonable.

In determining whether the delay in the payment of wages was reasonable, the Courts have applied a rather subjective test based upon good faith, Bender v. Waterman S.S. Corp., 166 F.2d 428 (3rd Cir. 1948), or moral justification, Forster v. Oro Navigation Co., 128 F. Supp. 113 (D.C.S.D.N.Y.1954), affirmed 228 F.2d 319 (2d Cir. 1955).

The proposition was stated thusly in The Trader, 17 F.2d 623, at pages 625–626 (D.C.E.D.S.C.1926):

"The statute does not mean that the refusal to pay the wages must be based upon an actual legal defense to the wages. If there were an actual legal defense to the wages, so that they would not be recoverable, the words 'without sufficient cause' would be superfluous. The statute means something different from this. It means, as I view it, that although it should turn out that there is no actual legal defense to the wages themselves, and that they ought to be paid, nevertheless the double wages would not attach, if the owner or master had sufficient cause to withhold the wages when demanded beyond the time mentioned in the statute."

In Bender v. Waterman S.S. Corp., supra, the Court stated as follows:

"The 'sufficient cause' to which Section 4529 refers need not amount to a valid legal defense to the claim for wages. (Citations) It includes a

reason for nonpayment asserted in good faith even though it may ultimately be held not to be a good defense. (Citations)"

Irregular absence from the vessel has been held to be sufficient cause to deny liability under the double wage statute. Buchanan v. United States, 24 F.2d 528 (D.C.N.D.Cal.1927); The Express, 129 F. 655 (D.C.S.D.N.Y.1904); The Cripple Creek, 52 F.Supp. 710 (D.C.E.D.Pa. 1943).

6. The Claimant-Respondent is entitled to a decree in its favor and entitled to recover of and from the Libelant its taxable costs.